UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELLE R. ROULEAU,

        Plaintiff,

                                                  CASE NO. 1:15-CV-546

v.

                                                  HON. ROBERT J. JONKER

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,

        Defendant.

_____/

## OPINION

Michelle R. Rouleau brings this action for long-term disability benefits against Defendant

Liberty Life Assurance Company of Boston ("Liberty") under 29 U.S.C. § 1132(a)(1)(B), a civil

enforcement provision of the Employee Retirement Security Act ("ERISA"). The parties have filed

cross-motions for entry of judgment on the record. (ECF No. 18, ECF No. 19.)[1] The motions are

fully briefed, and the Court has heard oral argument on the motions. This is the decision of the

Court.

## BACKGROUND

Ms. Rouleau worked for Sparrow Hospital as a registered nurse caring directly for patients

from approximately 2009 until her last day of work in June 2012. (ECF No. 17, PageID.589). As

---

[1]In a counter-claim, Defendant seeks reimbursement for overpayments made before the
Social Security Administration awarded disability benefits retroactively to Ms. Rouleau. (ECF No.
7, PageID.20.) Defendant initially identified the reimbursement amount as $7,240.00, but in its
motion papers, Defendant describes the reimbursement amount as $7,499.18 (ECF No. 7, PageID.20;
ECF No. 20, PageID.701.) Plaintiff does not contest the counter-claim and states that $7,499.18 is
the amount owed. (ECF No. 22, PageID.710.)

a full-time hourly employee at Sparrow, Ms. Rouleau participated in a group disability insurance policy that Liberty issued and administered (the "Policy").  With respect to long-term disability benefits, the Policy defines "disability" or "disabled" to mean that "during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial duties of [her] Own Occupation."  (*Id.*, PageID.64.)  The Policy further provides that after the 24 month period ends, "disability" or "disabled" means that "the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation."  (*Id.*)

### A.     Medical History – Pattern of Relief and Recurrence

Ms. Rouleau has a history of intractable lower back pain dating back at least as early as 2006. (*Id.*, PageID.269.)  The record reveals a pattern of her repeatedly seeking treatment, enjoying temporary relief, and then experiencing more pain.  In 2007, she had a lumbar facet rhizotomy for lumbar spine pain, with good results.  (*Id.*, PageID.200.)  But eventually her back pain recurred. Ms. Rouleau received treatment for back pain throughout 2011.  On February 14, 2011, on referral by her primary care physician, Dr. Mark Schaar, Ms. Rouleau consulted with Dr. Gundamraj and Nurse Spindler (M.S.N., R.N., C.S.) at the Sparrow Pain Management Center.  (*Id.*)  They noted that Ms. Rouleau "has had increasing thoracic spine pain over the past few months . . .  Her pain increases with sitting, standing, walking, lifting, carrying, housework, yard work, bending, and driving.  The pain decreases with cold and medications).  (*Id.*)  Dr. Gundamraj and Nurse Spindler assessed her condition as including thoracolumbar spine pain, thoracic disc displacement, thoracic spondylosis, lumbar spondylosis, and myofascial pain.  (*Id.*, PageID.201.)  They observed that Ms. Rouleau "has failed conservative treatment of her pain with reduction in activities of daily living."

(*Id.*)  They recommended that Ms. Rouleau have a series of four bilateral facet block procedures to occur approximately one to two weeks apart, and right and left thoracic epidural steroid injections. (*Id.*)

Ms. Rouleau had a series of appointments at the Pain Management Center, on February 17 and 25, 2011, and March 10, 18, and 25, 2011.  (*Id.*, PageID.248- 256.)  On February 17, she reported a pain level of seven out of ten, and on February 25, a pain level of seven or eight out of ten. (PageID.254-256.)  Treatment notes from her visit of March 10 reflect that her thoracic pain was "beginning to respond well to injection therapy," with a 40 - 50% reduction in her pain, and that Ms. Rouleau was "encouraged by her progress."  (*Id.*, PageID.252.)  On March 18, she reported a pain score of six out of ten.  (*Id.*, PageID.250.)   At her visit on March 25, Ms. Rouleau reported a 75 - 80% improvement in her pain level and noted that she had been able to tolerate increased activity.  (*Id.*, PageID.248.)  Her pain score was three to four out of ten.  (*Id.*)  She described her residual pain as tolerable with medication.  (*Id.*)  The medical team noted that Ms. Rouleau "responded well to interventional management" but that further intervention "may be needed in the future."  *Id.*

Just a few months later, in July 2011, Ms. Rouleau returned to the Pain Management Center "with chief complaint of low back pain and left lower extremity pain." (*Id.*, PageID.246.) Treatment notes comment that Ms. Rouleau has a history of pain that has "progressively worsened."  (*Id.*) Ms. Rouleau's thoracic spine pain remained at "a tolerable level," but her lower back pain interfered with activities of daily living.  (*Id.*)  Dr. Michael Winkelpleck recommended "interventional treatment for the low back and lower extremity pain."  (*Id.*)  Ms. Rouleau's pain level was nine out of ten.  (*Id.*)  She reported that on her best days, her pain level was four out of ten, and at worst, a

ten out of ten.  (*Id.*)  Ms. Rouleau had a series of epidural injections and bilateral facet blocks.  (*Id.*)

These treatments appeared to help.  On July 18, Ms. Rouleau reported a pain score of eight out of

ten; on July 25, six out of ten; on August 1, four out of ten; on August 8, three out of ten.  (*Id.*,

PageID.238-247.)  But on August 23, she presented with a pain score of ten out of ten.  (*Id.*,

PageID.236.)  Dr. Gundamraj recommended "radiofrequency rhizotomy . . . to provide longer relief

and improve functioning of the patient."  (*Id.*)  Ms. Rouleau had the procedure the same day.  (*Id.*,

PageID.236-237.)

Eight days later, Ms. Rouleau reported a pain score of eight out of ten.  (*Id.*, PageID.234.)

The examining physician determined that she had post-rhizotomy neuritis and performed a left

transforaminal epidural steroid injection.  (*Id.,* PageID.234-235.)  At her next appointment, on

September 13, 2011, Ms. Rouleau reported a pain score of six out of ten.  (*Id.*, Page ID.232.)

Dr. Gundamraj performed a right lumbar facet medial branch radiofrequency rhizotomy.  (*Id.*,

PageID.232-233.)  Ms. Rouleau returned on October 11.  (*Id.*, PageID.230.)  She reported relief on

the right side of her lower back but pain on the left side "lower into the back and buttock."  (*Id.*)  She

stated that her leg had given out and that she had fallen twice that week.  (*Id.*)  She described the pain

as "a constant burning sharp pain of severe intensity which increases with sitting, standing, walking,

lifting, carrying, house work, yard work, bending or transferring positions, and driving."  (*Id.*)  The

pain prevent[ed] her from falling asleep at night and . . . awaken[s] her at night."  (*Id.*)  She noted

that her pain ranged from two out of ten at best and nine out of ten at worst.  (*Id.*)  Ms. Rouleau

returned to the Pain Management Center on November 21 for a left dorsosacral transforaminal

epidural steroid injection.  (*Id.*, PageID.228.)  She had a pain score of five out of ten that day.  (*Id.*)

At her next appointment, in December 2011, she reported that the injection "provided phenomenal relief" and that her pain score was two out of ten.  (*Id.*)

## B.        Medical History - More Aggressive Treatment

Ms. Rouleau's pain soon returned.  In June 2012, Dr. Winkelpleck evaluated Ms. Rouleau for "left lower extremity pain and intractable lower back pain" and noted that conservative measures had failed.  (*Id.*, PageId.641.)   He recommended lumbar fusion surgery.  *(Id.*, PageID.636.) Ms. Rouleau took a short-term disability leave to have this surgery and planned to return to work within ten weeks.[2]  (*Id.*, PageID.134.)  Ms. Rouleau had the surgery on June 8, 2012.  She experienced temporary relief: a week after the procedure, Ms. Rouleau reported that her pain was an eight to ten before surgery and had decreased to a four or five after surgery.  (*Id.*, PageID.635.) But at her appointment on July 11, 2012, she reported that she had experienced "low back pain for the last week that has increased and gone down to her left buttock and down to the foot region." (*Id.*, PageID.625.)  She stated that "after surgery she was doing great and even improving and not really having any problems or difficulties, until about a week ago." *(Id.*)  She could "walk about 100 yards daily . . . [and] was doing it twice daily until about a week ago . . . [but] she needed to decrease this at this point." (*Id.*)  On August 14, 2012, her pain level was eight out of ten. (*Id.*, PageID.536.)  In September, her back pain had improved again, but she continued to have "a lot of left leg pain," which limited her walking. (*Id.*, PageID.533, PageID.529.)  Ms. Rouleau was not able to return to work, and she became eligible for long-term disability benefits effective September 4, 2012. (*Id.*, PageID.611.)

---

[2]Defendant administers the short-term disability policy under which Ms. Rouleau received short-term disability benefits.

Ms. Rouleau continued to seek treatment for her pain.  On October 22, 2012, Dr. Andary reported the results of an electrodiagnostic evaluation of Ms. Rouleau.  (*Id.*, PageID.552-553.)  He noted that Ms, Rouleau had undergone epidural steroid injections without lasting success and a back surgery with fusion.  Ms. Rouleau reported no pain in her right leg after surgery, but pain in her lower back and left leg had persisted.  (*Id.*)  She described the pain as a five to six out of ten.  (*Id.*)  She noted that she "stumbles sometimes because she catches her left toe and foot when she is walking as it does fatigue."  (*Id.*)  Dr. Andary found no electrodiagnostic evidence for certain conditions that could have explained her symptoms.  (*Id.*, PageID.553.)  He suspected that nerve root irritation caused her symptoms.  (*Id.*)

Ms. Rouleau saw Dr. Winkelpleck again on October 30, 2012, after having an injection for left total knee pain.  (*Id.*, PageID.556.)  She told him that she still had some numbness in her toes but that the pain in her left leg now extended only to her knee instead of all the way to her foot.  (*Id.*)  Her back pain was minimal.  (*Id.*)  Again the relief did not last.  In December 2012, Ms. Rouleau returned to Dr. Winkelpleck for an evaluation after having injection therapy for her continued lower left extremity pain following lumbar fusion and decompression.  (*Id.*, PageID.559.)  She stated that the injection provided no relief.  (*Id.*)  She complained principally of "left gluteal and lateral thigh pain on the left side."  (*Id.*)  Her back pain was still "there but nothing compared to the left lower extremity radicular component."  (*Id.*)  Ms. Rouleau was "frustrated and wants to know what to do next as far as alleviating her pain."  (*Id.*)

C.      **Medical History - Spinal Cord Stimulation**

Ms. Rouleau saw Dr. Winkelpleck again on February 12, 2013. (Id., PageID.505.) His notes state that she "continues to have left lower extremity and gluteal pain.  Her back pain is not

significant at this point.  It is more of an annoyance.  The foot pain that was present and just burning all the time has resolved and now the pain is more proximal in the gluteal region . . . ." (*Id.*) Dr. Winkelpleck found that "at this point it's reasonable to proceed with a spinal cord stimulator trial in the pain clinic." (*Id.*, PageID.507.)  He commented that Ms. Rouleau "has not returned to work but will consider returning to work as long as there is a sit stand option that does not require a lot of bending and lifting which is reasonable." (*Id.*)   He planned to see her again after a spinal cord stimulator trial.  (*Id.*)

Ms. Rouleau returned to the Pain Management Center in February 2013 for evaluation for spinal cord stimulation.  (*Id.*, PageID.216.)  It was noted that Ms. Rouleau had received epidural steroid injections over the course of months, most recently in October and November of 2012; that she had lumbar fusion surgery in June 2012; and that she was not a candidate for another surgery. (*Id.*)  After evaluation, Dr. Gundamraj and Nurse Simons (R.N., M.S.O.S.), sent Ms. Rouleau's case to "case conference with multi-disciplinary meeting of physicians, case managers, pain psychology, nurse practitioners, and physical therapy to further determine plan of care." (*Id.*, PageID.217.) Dr. Gundamraj and Nurse Simons noted that Ms. Rouleau "suffers from severe pain, which has been present for more than one year . . . [and] has failed to achieve satisfactory pain relief with all modalities of multidisciplinary pain management, including interventional techniques, cognitive-behavioral psychotherapy, medication management, and rehabilitation." (*Id.*) They commented that Ms. Rouleau's "pain remains significant, limits activities of daily living, and severely diminishes [her] quality of life." (*Id.*)

Dr. Winkelpleck evaluated Ms. Rouleau on February 12, 2013.  (*Id.*, PageID.505.)  He noted that she "continue[d] to have left lower extremity and gluteal pain" and that "her back pain is not

significant at this point." (*Id.*)  He commented that foot pain "that was present and just burning all the time has resolved and now the pain is more proximal in the gluteal region[;]" and that "[s]he does have difficulty sleeping on the left side." (*Id.*)  He determined that "[a]t this point it's reasonable to proceed with a spinal cord stimulator trial [at] the plain clinic." (*Id.*, PageID.507.)  He stated that Ms. Rouleau "has not returned to work but will consider returning to work as long as there is a sit stand option that does not require a lot of bending and lifting which is reasonable." (*Id.*)  He added that he would see her again after the spinal cord stimulator trial at the pain clinic. (*Id.*)  A note from Dr. Winkelpleck dated February 12, 2013, is addressed "to whom it may concern" and states that Ms. Rouleau will remain off work through March 22, 2013, for ongoing treatment for back pain, and that it remained to be determined when she would return. (*Id.*, PageID.504.)  A note from Dr. Winkelpleck dated February 12, 2013, is addressed "to whom it may concern" and states that "Ms. Rouleau is under my medical care.  She may NOT work at a position with direct patient care. However, she would be able to work in a sitting position with a sit to stand option, without bending, lifting, or twisting." (*Id.*, PageID.503.) (emphasis in original).

Dr. Camala Riessinger, a psychologist from the Pain Management Center, evaluated Ms. Rouleau on March 13, 2013. (*Id.*, PageID.261.)  Ms. Rouleau indicated to Dr. Riessinger that she was eager to work again. (*Id.*, PageID.261.)  Dr. Riessinger found Ms. Rouleau "very motivated to do everything she can to improve her condition." (*Id.*, PageID.260.)  Dr. Riessinger administered the MMPI-2 in April 2013 "to better understand this patient's level of functioning, her ability to cope with chronic pain, and to help with treatment planning to see if she is a good candidate from a psychological standpoint for an implantable pain control device." (*Id.*, PageID.259.)  Dr. Riessinger

found that Ms. Rouleau "has no evidence of a thought disorder . . . no history of substance abuse . . . [and] realistic expectations with regard to the stimulator." (*Id.*)

Ms. Rouleau had a trial spinal cord stimulation procedure on June 17, 2013. (*Id.*, PageId.210. PageID.213-214.)   At the time of her discharge, Ms. Rouleau reported that the spinal cord stimulation was providing approximately 80 % coverage of the previously painful area and 50% pain relief.  (*Id.*, PageID.212.)   The next day, she reported pain relief that was "significant" but "not complete," and a pain score of eight out of ten.  (*Id.*, PageID.208.)   The treating physician, Dr. Silverstein, reprogrammed the device, after which Ms. Rouleau reported "100% coverage of the primary painful areas with about 50% pain relief, at least while sitting, standing, and walking briefly in the office." (*Id.*)   The day after that, Ms. Rouleau had a pain score of three out of ten.  (*Id.*, PageID.205.)

In July 2013, Defendant hired a company to conduct surveillance on Ms. Rouleau's home. (*Id.*, PageID.125.)  Surveillance of the residence took place on July 6, 7, 8, 9, 13, and 16, 2013.  (*Id.,* PageID.451-465).  Surveillance yielded no sign of Ms. Rouleau engaged in any activity on four of the six days: July 6, 7, 8, or 16.  (*Id.*)  On July 9, surveillance yielded video of Ms. Rouleau totaling approximately 12 minutes.  (*Id.*, PageID.453.)  The report states that the video "depicts the claimant as she walked, bent at the waist several times, appeared to clean the interior of the vehicle and entered the vehicle.  The claimant appeared to ambulate in a normal manner, without restrictions of the use of visible medical devices." (*Id.*)  The report describes the video quality as "average." (*Id.*) On July 13, surveillance yielded video of Ms. Rouleau totaling approximately 90 minutes.  (*Id.*) According to the report, the video depicts Ms. Rouleau "walking, bending at the waist, using a pool skimmer to clean a pool, moving several pieces of outdoor furniture, using a leaf blower and garden

hose, traveling by car, getting gas, setting up an outdoor canopy, and conversing with others. (*Id.*) The report notes that "the claimant appeared to ambulate in a normal manner, without restrictions of the use of visible medical devices." (*Id.*) The report describes the video quality as "fair." (*Id.*)

Ms. Rouleau had permanent placement of a spinal column stimulator on September 9, 2013. (*Id.*, PageID.204.) The next month, she presented at the Pain Management Center with intermittent mild to moderate pain. (*Id.*) Her pain score ranged from three to five out of ten. (*Id.*) She reported approximately 75% coverage of previously painful areas and a pain reduction of approximately 50%. (*Id.*) She reported that she had been "able to increase her activities significantly," albeit with flares of pain during activity. (*Id.*) Overall, she was pleased with the results of the spinal cord stimulator. (*Id.*) Two months later, she continued to report the same degree of coverage and pain relief. (*Id.*) Her pain score ranged from three at best to five or six at worst. (*Id.*) She described her pain as intermittent, "moderate pain of aching intensity, increasing particularly with standing and walking or bending." (*Id.*) Her pain continued to interfere with her sleep. (*Id.*)

The record reflects that in addition to her back pain, Ms. Rouleau had carpal tunnel syndrome in both hands. She reported to Dr. Horner in 2012 that she had pain at a level seven or eight out of ten in her left hand; numbness in both hands; and had been dropping things. (*Id.*, Page ID.146-50.) The condition worsened. Dr. McDermott performed carpal tunnel surgery on both her hands in the fall of 2013. (*Id.*, PageID.136-39.) Surgery ameliorated the carpal tunnel symptom, but numbness and tingling remained present. (*Id.*)

Ms. Rouleau completed Activities Questionnaires at Liberty's request in 2012, 2013, 2014. (*Id.*, PageID.584-86; PageID.446-49; PageID.374-78.) The questionnaires track the deterioration the medical records reflect. In August 2012, two months after lumbar fusion surgery, Plaintiff

indicated she could sit one to two hours; stand half an hour; and walk for half an hour. (*Id.*, PageID.584.) She spent approximately ten hours a day in bed. (*Id.*) On July 22, 2013, she indicated she could sit for 45 minutes to an hour; stand fifteen minutes; and walk for fifteen minutes. (*Id.*, PageID.446.) She needed assistance in grocery shopping, cleaning, and doing laundry. (*Id.*, PageID.449.) Asked to describe in her own words what prevented her from engaging in any gainful employment, she answered, "pain in back – leg pain – difficulty in sitting standing and walking for any length of time . . . can carry light objects – difficulty walking up stairs." (*Id.*, PageId.448.) On January 2, 2014, in her final activities questionnaire, Ms. Rouleau indicated there had been no change in the amount of time she could sit or stand and that she now spent fourteen hours a day in bed. (*Id.*, PageID. 374.) She could drive a car for forty-five minutes. (*Id.*) She needed assistance in grocery shopping, carrying groceries, cooking, cleaning, and doing the laundry. (*Id.*, PageID.375.) In response to the question asking what prevented her from engaging in any gainful employment, she wrote, "no change." (*Id.*, PageID.376.)

> **D.     Claims History**

In August 2013, Defendant encouraged Ms. Rouleau to apply for disability benefits from the Social Security Administration ("SSA"). (*Id.*, PageId.422-23.) Early in 2014, the SSA awarded Ms. Rouleau disability benefits retroactive to December 2012. (*Id.*, PageID.312.) Under Defendant's Social Security Reimbursement Agreement, Ms. Rouleau was required to reimburse Defendant for the amount of Social Security benefits she received retroactively. (*Id.*, PageID.416-17.)

Defendant has never disputed that Ms. Rouleau was entitled to benefits throughout the "own occupation" period. In April 2014, as the beginning of the "any occupation period" in September

approached, Defendant referred Ms. Rouleau's medical file for peer review, to prepare for the end

of the two-year "own occupation" period of benefits in September 2014. (*Id.*, PageID.121.)

Dr. Patel conducted the review. Dr. Patel reviewed Ms. Rouleau's medical records but did not

examine Ms. Rouleau personally. Dr. Patel did not speak with any of Ms. Rouleau's medical

providers directly. Dr. Patel opined that

> based on the medical evidence, the claimant would be capable of lifting 20 pounds
> occasionally and sitting up to one hour at a time, for a total unrestricted sitting in an
> 8 hour day with the ability to change positions for comfort. Standing and walking
> would be unrestricted. Prognosis is good for return to full time work with above
> restrictions and limitations. The above restrictions would be considered permanent
> due to the chronic nature of claimant condition.

(*Id.*) Relying exclusively on Dr. Patel's opinion for medical context, a vocational specialist

determined that Ms. Rouleau would be capable of performing other occupations. Accordingly,

Defendant concluded that Ms. Rouleau was not entitled to benefits under the Policy once the "own

occupation" period expired. Defendant terminated Ms. Rouleau's benefits effective September 4,

2014. (*Id.*, PageID.118-119.)

Ms. Rouleau appealed the decision. Her primary care physician, Dr. Schaar, completed

Liberty's Attending Physician's Assessment of Capacity form in February 2015. (*Id.*, PageID.170.)

He opined that Ms. Rouleau had uncontrolled pain; could not function full-time in an occupational

setting; and that this condition was permanent. (*Id.*, PageID. 170). Dr. Schaar's report was part of

the record Defendant considered in deciding Ms. Rouleau's appeal. (*Id.*, PageID.159.) On appeal,

Defendant again concluded that Ms. Rouleau was not entitled to benefits because, according to

Defendant, she could perform work in other occupations. (*Id.*)

This lawsuit ensued.

**LEGAL STANDARDS**

ERISA regulates, among other things, employee welfare benefit plans that provide insurance

benefits in the event of disability.  *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604 (6th Cir.

2009).  "ERISA permits a participant or beneficiary to bring a civil action (1) 'to recover benefits

due to him under the terms of his plan,' (2) 'to enforce his rights under the terms of the plan,' or (3)

'to clarify his rights to future benefits under the terms of the plan.'"  *Id.* (quoting 29 U.S.C.

§ 1132(a)(1)(B)).  The parties agree that this action should be resolved under the procedural

guidelines set out in *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998).  Under

*Wilkins*, the Court determines the applicable standard of review and whether the material in the

administrative record supports the denial of benefits under the applicable standard of review.  150

F.3d at 613, 616–19.

Courts ordinarily review de novo an ERISA plan administrator's decision to deny benefits.

*Evans v. Unum Provident Corp*., 434 F.3d 866, 875 (6th Cir. 2006) (citing *Jones v. Metro. Life Ins.

Co.*, 385 F.3d 654, 659–60 (6th Cir. 1998)).  However, where the ERISA plan grants a plan

administrator discretionary authority to determine eligibility for benefits or to construe the plan

terms, the Court reviews the denial of benefits under the "highly deferential arbitrary and capricious

standard of review."  *Id.*  In 2007, the Michigan Office of Financial and Insurance Services (OFIS),

under its authority to regulate insurance, promulgated rules prohibiting insurers from issuing,

delivering, or advertising insurance contracts or policies that contain discretionary clauses giving

deference to plan administrators.  *Am. Council of Life Insurers*, 558 F.3d at 602 (citing Mich. Admin.

Code R. 500.2201–500.2202 and 500.111–550.112).  The Sixth Circuit has held that ERISA does

not preempt state administrative rules that prohibit discretionary clauses.  *Id.* at 608–09.  In effect,

Rule 500.2202 voids discretionary clauses in insurance policies issued after June 1, 2007, thus requiring a reviewing court to apply a de novo standard of review. *See id.* at 603, 609.

In this case, the parties agree that Rule 500.2202 applies to the Policy, and the applicable standard of review is de novo. Where the de novo standard applies, the role of the reviewing court is to determine whether the denial of benefits was the "correct decision." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). The plaintiff bears the burden of proof, and a preponderance of the evidence standard applies. *Javery v. Lucent Technologies, Inc. Long Term Disability Plan for Management or LBA Employees*, 741 F.3d 686, 700-701 (6th Cir. 2014). The court must review the "record before the administrator" without granting "deference . . . or any presumption of correctness" to the administrator's determination. *Id.* The de novo standard of review "applies to the factual determinations as well as to the legal conclusions of the plan administrator." *Wilkins*, 150 F.3d at 613. A court should not hear or consider evidence not presented to the plan administrator in connection with a claim. *Perry*, 900 F.2d at 966. Indeed, a court must "simply decide[] whether or not it agrees with the decision under review." *Id.*

## DISCUSSION

A preponderance of the evidence weighs in favor of a benefits award. The record evidence includes, without limitation, Ms. Rouleau's treatment records from the Sparrow Pain Management Center, which span February 2011 through December 2013 and encompass both medical and psychological reports; treatment records from the MSU Spine Center, spanning June 2012 through September 2013; a June 2012 post-operative report from Sparrow Hospital; records of radiology imaging and other diagnostic testing throughout 2011 - 2013; records of treatment for carpal tunnel syndrom in 2012 and 2013; Dr. Patel's Peer Review Report of March 2014; the Transferrable Skills

Analysis/Vocational Review dated April 10, 2014; Dr. Schaar's Assessment of Capacity dated

February 5, 2015; Ms. Rouleau's Activities Questionnaires; and the award of disability benefits by

the Social Security Administration.

      A.      **Preponderance of the Evidence**

The administrative record includes both subjective and objective evidence of Ms. Rouleau's

impairment.   The Court gives great weight to the Social Security Administration's ("SSA")

determination that Ms. Rouleau is totally disabled from employment.  It is well-established that "[a]

determination that a person meets the Social Security Administration's uniform standards for

disability benefits does not make her automatically entitled to benefits under an ERISA plan, since

the plan's disability criteria may differ from the Social Security Administration's.*" DeLisle v. Sun*

*Life Assur. Co. of Canada*, 558 F.3d 440, 445-46 (6th Cir. 2009).  But the SSA's determination is

"far from meaningless." *Calvert v. Firstar Finance, Inc.*, 400 F.3d 286, 294 (6th Cir. 2005).  To the

contrary,

> [i]f the plan administrator (1) encourages the applicant to apply for Social Security
> disability payments; (2) financially benefits from the applicant's receipt of Social
> Security; and then (3) fails to explain why it is taking a position different from the
> SSA on the question of disability, the reviewing court should weigh this in favor of
> a finding that the decision was arbitrary and capricious.

*Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 554 (6th Cir. 2008).[3]   Here, Defendant Liberty Life

encouraged Ms. Rouleau to apply for Social Security disability benefits and financially benefitted

from her award of disability benefits. Defendant says that it reached different conclusion from the

Social Security Administration because, unlike the Social Security Administration, it was not

---

[3]While the arbitrary and capricious standard does not apply in this case, the Court finds the
case law persuasive in evaluating the evidence.

required to follow the treating physician rule.  Defendant fails to explain why it afforded greater weight to Dr. Patel's file review than to the reports of Ms. Rouleau's own treating physicians.  In its de novo review, the Court weighs the SSA determination heavily.

The Court also particularly credits the records of Ms. Rouleau's treatment at the Pain Management Center.  These records reveal a clear pattern in which Ms. Rouleau for years experienced severe pain in her back and lower extremities; received treatment that helped in the short-term; and the return of her pain.  The records reflect that Ms. Rouleau continued to experience pain ranging between a three and six out of ten even after permanent implantation of the spinal cord stimulator.  Her pain ebbed and flowed but was always present.  Dr. Riessinger, the psychologist at the Pain Management Center noted explicitly that Ms. Rouleau expressed eagerness to return to work and was not a malingerer.

Dr. Schaar's report dated February 5, 2015 also weighs in favor of Ms. Rouleau's claim for benefits.  Dr. Schaar was Ms. Rouleau's primary care physician throughout the period at issue. Dr. Schaar referred Ms. Rouleau to the Pain Management Center early in February 2011 and was still her treating physician in 2015.  His February 2015 report was not part of the record when Liberty Life made its initial determination denying benefits after the "own occupation" period expired, but in its appeal decision Liberty Life noted explicitly that the report was among the materials considered in connection with her appeal.  Dr. Schaar's report (on Liberty Life's own Assessment of Capacity Form) described Ms. Rouleau incapable of functioning in an occupational setting.  (ECF No. 17-2, PageID.170.)  Dr. Schaar said Ms. Rouleau could stand, walk, or drive no more than ten minutes at a time.  (*Id.*)  He said she could push or pull no more than ten pounds, and he cautioned against her climbing, squatting, bending, kneeling, or forcefully grasping.  (*Id.*)  He said she could not lift even

ten pounds.  (*Id.*)  Dr. Schaar described Ms. Rouleau's limitations as permanent.  (*Id.*)  Liberty Life

now says it discounted Dr. Schaar's opinion because Dr. Schaar did not provide independent

treatment records in support of the opinion.  But Dr. Schaar's opinion is fully consistent with the

medical evidence from the Pain Management Center and the Michigan Spine Center.  The Court

credits his opinion.

The Court assigns less weight to Dr. Patel's report.  Although the Sixth Circuit has stated

unequivocally that there is "nothing inherently objectionable about a file review by a qualified

physician in the context of a benefits determination," *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296

(6th Cir. 2005), the court has also approved assigning more weight to evidence from a treating

physician than a record reviewer who did not conduct an in-person evaluation.  *See Hoover v.

Provident Life & Accident Ins. Co.*, 290 F.3d 801, 806 (6th Cir. 2002) ("The evidence presented in

the administrative record did not support the denial of benefits when only Provident's physicians,

who had not examined Hoover, disagreed with the treating physicians.").  "Whether a doctor has

physically examined the claimant is indeed one factor that we may consider in determining whether

a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its

consulting physician." *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston*, 419 F.3d 501,

508 (6th Cir. 2005); see also *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)

("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence,

including the opinions of a treating physician.").

The Court discounts Dr. Patel's opinion for multiple reasons.  Dr. Patel never examined

Ms. Rouleau.  It is undisputed that the file materials on which he based his opinion were incomplete.

These materials did not include Ms. Rouleau's medical records from 2011 and did not include her

self-reports on Liberty's Activities Questionnaires.  (ECF No. 17-2, PageID.195-196.)  Nor did the

file materials Dr. Patel reviewed include the SSA's finding that Ms. Rouleau was totally disabled

from working.  (*Id.*)  Dr. Patel's report does not take into account the variable nature of pain.  Nor

does his report explain how he extrapolates from the limited medical evidence he reviewed that, even

if Ms. Rouleau could sit for up to one hour with an option to stand, she could also do so for eight

hours a day without any restrictions on her standing and walking.  For all of these reasons, the Court

assigns little weight to Dr. Patel's report.

The Court finds credible Ms. Rouleau's descriptions of her condition on the Activities

Questionnaires she requested.  The record reflects that Ms. Rouleau was eager to return to work.  Her

self-reports on Activities Questionnaires are consistent with the medical evidence.  No one who

treated Ms. Rouleau suggested she exaggerated her pain in any way.  Her medical providers

repeatedly noted her frustration with her ongoing pain and her desire to find relief.

### B.      Liberty's Arguments

In defending its denial of benefits to Ms. Rouleau after the expiration of the "own

occupation" period, Liberty emphasizes Dr. Patel's report and the vocational assessment based on

Dr. Patel's report.  The Court discounts Dr. Patel's report for the reasons already discussed.  And

because Dr. Patel's report is the only medical evidence underpinning the vocational assessment, the

Court discounts the vocational assessment as well.

Liberty also emphasizes Dr. Winkelpleck's comment in February 2013 that Ms. Rouleau

could work  in a sitting position with a sit to stand option, without bending, lifting, or twisting.  A

thorough review of the record reveals that this was an isolated note.  The record reflects an ongoing

history of pain, increasingly aggressive treatment, relief, and the return of pain.  Dr. Winkelpleck's

records reflect that Ms. Rouleau continued to have pain severe enough to warrant implantation of a spinal cord stimulator and that she had ongoing pain even after that.  The record evidence, including Dr. Winkelpleck's own assessments of her condition, outweighs the single comment.

Liberty points to the results of video surveillance as further evidence to support the denial of benefits.  The Court views this evidence as neutral at most.  It does not appear that Liberty actually relied on the surveillance evidence in making its decision to deny benefits to Ms. Rouleau at the end of the "own occupation" period.  Liberty does not mention the surveillance in its correspondence to her regarding its denial of her claim.  (ECF No. 17-2, PageID.152-55, PageID.188-192.  Moreover, the surveillance video is consistent with Ms. Rouleau's own account of her condition.  Surveillance revealed no activity at all on most of the days surveillance took place. The activity that surveillance did show was limited and offers little support for Liberty's position. In the video of Plaintiff unloading what appear to be groceries from her car, she moves slowly and gingerly.  She takes frequent breaks.  Her posture is stooped.  After she bends down to reach into the car, she stands up slowly and with effort.  Nothing about the video of her unloading the car suggests she is able to maintain even a short period of activity without frequent breaks.  The surveillance company itself describes the quality of the video of Ms. Rouleau working in the area around her pool as only "fair."  In that video, Ms. Rouleau appears to move slowly and take frequent breaks.  Nothing about the video dictates a conclusion that Ms. Rouleau was capable of employment.  The Court assigns no weight to the video surveillance.

None of Liberty's arguments persuade the Court that a denial of long-term disability benefits to Ms. Rouleau is appropriate.   Everyone who treated Ms. Rouleau, and even Dr. Patel, who reviewed only a portion of her medical records, recognized that Ms. Rouleau objectively had health

problems.  Everyone recognized that her health problems made it impossible for her to care for patients directly, her "own occupation."  No one suggests Ms. Rouleau had any inclination to malinger or exaggerate her condition.  There is a clear pattern over the years of escalating treatments required to address her pain.  The SSA found Ms. Rouleau totally disabled from working.  The preponderance of the evidence – indeed, the great weight of the evidence – reflects that Ms. Rouleau remained "disabled" as the Policy defines it even after the expiration of the "own occupation" period and is therefore entitled to the long-term disability benefits she seeks.

## CONCLUSION

For the reasons stated above, the Court finds that a preponderance of the evidence supports Ms. Rouleau's claim that she is eligible for long-term disability benefits under the Policy.  An Order and Judgment will enter accordingly.

Dated:      January 25, 2017           /s/ Robert J. Jonker
                                       ROBERT J. JONKER
                                       CHIEF UNITED STATES DISTRICT JUDGE